UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JULIAN DAVIDSON,

                              Plaintiff,

    – against –

LONG BLOCKCHAIN CORP.,

                              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18 Civ. _____

Plaintiff Julian Davidson ("Davidson" or "plaintiff") by his undersigned attorneys, Epstein Becker & Green, P.C., as and for its complaint against the defendant, Long Blockchain Corp. ("LBCC" or "defendant") alleges as follows:

### Parties

1. Davidson is a citizen and resident of New Zealand, residing in Auckland, New Zealand.

2. LBCC is a corporation organized under the laws of the State of Delaware. LBCC is a cryptocurrency and beverage company with its principal office at 12-1 Dubon Court, Farmingdale, New York.

### Jurisdiction and Venue

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as this is a controversy between a citizen of a foreign state and a citizen of the states of New York and Delaware, in which the amount in controversy exceeds $75,000, exclusive of interest and costs.

4. Venue is proper in this district pursuant to 28 U.S.C. §1391 as the defendant has substantial jurisdictional contacts with the Southern District of New York. Further, the parties agreed in the Separation Agreement that an action or proceeding arising under or with respect to that agreement would be brought in a federal or state court in New York County, New York.

## Summary of Action

5. Davidson - formerly the Executive Chairman of LBCC - seeks to enforce a Separation Agreement that he reached with LBCC, as well as to collect other compensation owed to him in connection with his employment which terminated effective December 31, 2017. Davidson respectfully demands that LBCC honor the terms of separation that were negotiated and agreed upon, which Davidson relied upon in resigning from LBCC, and provide to him without further delay all compensation and equity that he is owed.

## Background

6. Until December 19, 2017, LBCC was known as Long Island Iced Tea Corp. ("LTEA"), and focused its business on the sale and distribution of iced tea beverages.

7. LTEA was formed through the May 2015 merger of (1) Long Island Brand Beverages ("LIBB"), an operating business founded, majority owned and run by Phil Thomas, who later became the CEO of LTEA, and (2) Cullen Agricultural Holdings, an over the counter (previously Australian Securities Exchange) listed special purpose acquisition company controlled by Eric Watson, a New Zealand entrepreneur living in the UK.

8. After the merger, LTEA became the listing entity and holding company, and the operating company was LIBB.

9. Davidson met Eric Watson in November 2014.

10. In May 2015, Davidson became a consultant to LTEA with objectives to support an uplisting to the NASDAQ exchange and raise $10 to 20 million in capital at the time of the uplisting.

11. Davidson travelled from New Zealand to New York regularly from May 2015 to May 2017, when he relocated to New York.

12. LTEA was listed on the NASDAQ Exchange for the first time in July 2016.

13. As of June 16, 2017, Davidson executed an Employment Agreement with LTEA (the "Employment Agreement") and became employed as LTEA's Executive Chairman.

14. As LTEA's Executive Chairman, Davidson's initial responsibilities were:

- Serve as Chairman of the Board, ensuring the legal and appropriate operation of the Board, sub-committees of the Board, and Advisory Groups.
- Provide long term strategic direction to the company, producing 3-5 year strategic plans and annual operating plans.
- Engage with shareholders and investors.

15. These responsibilities aligned with and complimented the roles of two incumbent executives / directors, Paul Vassilakos and Phil Thomas. Vassilakos was an LTEA Board member who managed the process and detail of the NASDAQ uplisting, managed IR programs, and interfaced with Eric Watson. Thomas was the founder of LTEA and was devoted to running the business.

16. In mid 2017, LTEA experienced several challenges. It came under significant working capital and cashflow pressure, and was not growing as expected, causing its stock price to be suppressed.

17. In June 2017, LTEA terminated the employment of its CEO Rich Allen. As a result, in addition to his existing duties, Davidson became LTEA's CFO and the senior accounting head for audit / governance purposes. This materially added to his workload.

18. In October 2017, Paul Vassilakos resigned, and 100% of his responsibilities were passed to Davidson, with no corresponding change in terms or compensation offered to him. This happened simply to keep the company running. As a consequence of this change, Davidson:

- Completed an October capital raise that was in progress;
- Took over running Investor Relations; and
- Accelerated a merger and acquisition program to enhance the effectiveness of future capital raising.

19. With this change, Davidson's workload with up to five merger and acquisition projects running, a planned capital raise for December/January, ongoing investor relations programs, his existing Executive Chairman duties, and his recently-assumed duties as CFO, was unsustainable.

20. In addition to this, Davidson became the conduit for Eric Watson - a very engaged and demanding material shareholder - into the business, which in the past Vassilakos had managed.

21. From September through December 2017, Eric Watson put incredible pressure upon Davidson, in addition to his overwhelming duties described above, to explore and move the company into more attractive areas of investment, including the cryptocurrency area.

22. By November 2017, Davidson had reached levels of engagement, stress and lack of resources to levels where he could barely function. Davidson informed the Board

that he could not be Chairman through the evaluation of the projects and repositioning of the company – to focus on cryptocurrency – that Eric Watson was demanding.

23. Seeking to secure Davidson's continued employment, the Board suggested that it would provide Davidson with extra resources, additional compensation and the ability to spend more time with his family in New Zealand. Davidson stayed on.

24. On or about December 19, 2017, LTEA accepted a funding package facilitated by Eric Watson, agreed to take on two new board members who have Blockchain expertise, undertook to pursue Blockchain opportunities, and undertook to explore spinning out its beverage business. In conjunction with these undertakings, the company changed its name from Long Island Iced Tea Corp. ("LTEA") to Long Blockchain Corp. ("LBCC"). The LBCC Board resolved to proceed with running the business along these terms.

### The Agreement to Provide Davidson With a Separation Package, and LBCC's Attempts to Avoid That Agreement

25. After gaining a verbal commitment from LBCC's CEO Philip Thomas that Davidson would receive a separation package, Davidson resigned from LBCC on December 19, 2017, effective December 31, 2017.

26. Davidson submitted his resignation in reliance on the representation from LBCC's CEO that he would receive a separation package, and the terms of that separation package were understood as between Davidson and LBCC.

27. Davidson would not have resigned at that time if he had not received LBCC's agreement, conveyed through Thomas' verbal commitment, to provide Davidson with a separation package.

28. Davidson and Thomas immediately began memorializing the terms of that agreement in email correspondence. On December 20, 2017, Thomas emailed a list of terms to Davidson, and wrote: "Spoke to Jack. Please see counter below, subject to comp committee final

5

review / approval. Are you good with these terms?" Davidson responded later that day: "This is agreed, subject to inclusion of mutual releases, and termination agreement reflecting this final email exchange."

29. The very next day, on December 21, 2017, Thomas advised Davidson, "I just received approval from [LBCC's] comp committee in re: your settlement package. Graubard is on process of finalizing agreement for execution."

30. On December 26, 2017, Thomas sent a draft Separation Agreement. On December 27, 2017, Davidson provided some minor mark-ups and questions as to the settlement agreement, seeking to finalize it expeditiously.

31. At that point, however, LBCC became largely unresponsive to Davidson's efforts to wrap up the form of the settlement agreement.

32. After several email entreaties by Mr. Davidson, on January 14, 2018, Thomas advised Davidson that a certain shareholder had asked to have Davidson speak with Shamyl Malik, a new Board member. Davidson quickly replied that he was happy to communicate by email with any Board member, but Malik never contacted him. Davidson continued to ask that his written Separation Agreement be finalized.

33. On February 7, 2018, William Hayde (Chairman of LBCC's Board of Directors) advised Davidson that the "Committee has determined that it is not in a position to agree to any separation agreement at this time." In response, Davidson pointed out that the parties had agreed to a deal and that the Compensation Committee had ratified it, and that the parties had progressed to preparing the Separation Agreement.

34. Also in his response to Hayde's February 7, 2018 email, Davidson provided to Hayde an itemized list of amounts past due to him pursuant to the terms of his

Employment Agreement. These amounts totaled approximately $221,453. Most of the items on that list have not been paid and remain long overdue and owing.

35. Despite Davidson's reliance on the Separation Agreement that he reached with LBCC, the Company has been unwilling to finalize the Separation Agreement or to provide Davidson the compensation and equity that it promised.

36. The amounts of overdue compensation, expense reimbursements, accrued cash bonus, severance payments, stock, and accelerated vesting of options to Davidson which were agreed to by LBCC totaled over $250,000. In addition, without the stock and options being granted under the Separation Agreement, Davidson may also miss an opportunity to sell these on market from April 1, 2018, and therefore is likely to suffer additional losses.

37. On February 20, 2018, counsel for Davidson sent a letter to Shamyl Malik (CEO of LBCC) and William Hayde (Chairman of LBCC's Board of Directors) demanding that LBCC honor the Separation Agreement it had reached with Davidson, and provide him with the monetary amounts and equity that it owed him.

38. On February 26, 2018, counsel for LBCC responded to the February 20, 2018 letter and asserted that LBCC had no further obligations to Davidson, absent further agreement between the parties.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract – Separation Agreement)

39. The plaintiff realleges the allegations herein above made.

40. Davidson and LBCC agreed upon the terms of a Separation Agreement.

41. The Separation Agreement is enforceable and imposes upon LBCC certain contractual obligations.

42. Davidson fully performed his obligations to LBCC pursuant to the Separation Agreement.

43. By its actions described above, including its failure to pay Davidson the monies owed to him, LBCC breached the Separation Agreement, resulting in harm to Davidson.

44. By virtue of the foregoing, LBCC is liable to Davidson for substantial monetary damages, in an amount to be determined at trial but the total of which is in excess of $75,000.

## SECOND CLAIM FOR RELIEF
(Promissory Estoppel)

45. The plaintiff realleges the allegations herein above made.

46. By virtue of the above, LBCC made a clear and unambiguous promise to provide Davidson with a separation package, the terms of which were set forth and understood by the parties.

47. Davidson relied on LBCC's promise to provide him with the separation package, and accordingly resigned his employment with LBCC.

48. Davidson has suffered harm as a result of that reliance. He is without employment, and has not received the amounts promised to him in the separation package.

49. LBCC's refusal to enforce the promise that it made to provide Davidson with the separation package is an injustice to Davidson.

50. By virtue of the foregoing, LBCC is liable to Davidson for substantial monetary damages, in an amount to be determined at trial but the total of which is in excess of $75,000.

## THIRD CLAIM FOR RELIEF
(Breach of Contract – Employment Agreement)

51. The plaintiff realleges the allegations herein above made.

52. Davidson and LBCC executed the Employment Agreement.

53. The Employment Agreement is enforceable and imposes upon LBCC certain contractual obligations.

54. Davidson fully performed his obligations to LBCC pursuant to the Employment Agreement.

55. By its actions described above, including its failure to pay Davidson the monies owed to him, LBCC breached the Employment Agreement, resulting in harm to Davidson.

56. By virtue of the foregoing, LBCC is liable to Davidson for substantial monetary damages, in an amount to be determined at trial but the total of which is in excess of $75,000.

### Prayer for Relief

WHEREFORE the plaintiff demands judgment as follows:

(1) awarding plaintiff compensatory damages in an amount to be determined at trial, together with pre-judgment interest;

(2) awarding plaintiff his costs and attorneys' fees reasonably incurred in connection with this proceeding; and

(3) granting plaintiff such other and further relief as may be just and proper.

Dated: New York, New York  
March 12, 2018

EPSTEIN BECKER & GREEN, P.C.

By: *David J. Clark* (signature)  
David J. Clark  
250 Park Avenue  
New York, New York 10177  
(212) 351-4500  
dclark@ebglaw.com  
*Attorneys for the Plaintiff*